Good morning, Your Honor. It's Jason Carr appearing on behalf of Brose Roberts. Timing, statements indicating that a defendant does not wish to speak to law enforcement, what to make of those statements, those are all important questions in this case, but probably the easiest thing for the court to focus on is what to make of directives that show your hands. Specifically, how does that interplay with a theory that this was a consensual encounter? And the answer is, of course, that it doesn't, because it doesn't make any sense. A consensual encounter, what the Supreme Court has told us in cases like Bostick, Drayton, Mendenhall, is that consensual encounter means that a reasonable person would feel free to disregard the police and go about their business, feel free to disregard their commands. So the government's theory here is that they can order my client to show his hands, but he's free to go about his business? What, with his hands up? I mean, how does it work? Well, it doesn't work. And this Court's precedent says that clearly, in cases such as Monzo, Eduardo, would say that in order to show hands equals a seizure. And that is important in this case because the timing of the seizure is important. The district court, the government's theory here is that the seizure did not occur until approximately three minutes after the initial encounter of law enforcement with Mr. Roberts, three minutes of time. And even worse, what the government and the district court does is interweave my client's disinclination to engage into the encounter, his statements indicating, I do not wish to speak with you. They use those factors against him in the reasonable suspicion calculus. And that is, I would submit, incorrect, that those factors are not a permissible resort. And you would see in many other areas of constitutional jurisprudence an idea that a client's statement, a defendant's statement that, no, I do not wish to speak with you, cannot be used to find suspicion. That when you exercise a constitutional right, that is not suspicious, is what the law says. If we agreed with you and said, well, all right, once they tell him, once the officer, if she tells him to keep his hands up and say that that's a monstruatory stop, was there reasonable suspicion even at that point? That's an excellent question. Was there reasonable suspicion at the inception of this encounter? What the law enforcement had at that time was a call from a citizen, a 311 call, that there were individuals by this car that were either engaging in a drug deal, either stripping the car, or doing something else. And that point is important, and it's on pages 131 and 132 of the excerpt for record, that what this citizen described is so generalized, it really just amounts to a hunch. They're doing something out there. He's not giving any specific factual observations. They are breaking glass of the car. They are taking a radio out of the car. There's nothing like that. There's only this person's subjective impression that something is just not right. That is, if that isn't a hunch, I don't know what is. The law is very clear that a law enforcement hunch is not alone enough for reasonable suspicion. Well, what if a citizen's hunch? A citizen doesn't even have the expertise and training that a law enforcement officer has. Certainly a citizen's hunch alone should not be enough to support reasonable suspicion, and that is all they had when they showed up. And they begin this encounter with Mr. Roberts. And in my estimation, when you look at pages of the record, the officer's testimony that is found on pages 100, 101, 102, that is the key to this case. Because what Mr. Roberts tried to do was communicate a desire not to engage in an encounter. And he tried to do that pretty clearly, but he did not use, I suppose, the government's – the government would ask that he utter some talismanic phrase. In fact, the district court said that you have to unequivocally establish, unequivocally voice, that you don't want to engage in an encounter. First of all, there's no law that says that. I am not aware of any case law that says that the defense counsel has to prove that this person unequivocally stated he did not want to engage in an encounter. There is no law that says he has to use some kind of talismanic phrase. What did he do here? This is another point that I believe is significant. He asked why. Why do I have to talk to you? She never answered the – she did not answer the question, because what is the answer? The answer is you do not. You do not have to speak to me. Now, the law is – this can be a little confusing. The law is clear that there's no Miranda prophylactic function in Fourth Amendment jurisprudence. Law enforcement does not have to inform somebody that they do not have to consent or you don't have to talk to me. But it's a different question when the government is trying to say this is a consensual encounter. The defendant was asking why he has to engage in a consensual encounter, and law enforcement doesn't answer the question. They never say, no, you don't have to do it. That's – that's significant. And doesn't that cut against heavily that this was a consensual encounter? Virtually everything Roberts did here screams out, I don't want to walk up to you, I don't want to be searched, I don't want to talk to you. Did he say he didn't want to be searched before he was told to keep his hands out of his pockets? Hands was the first thing that came out. She told him, I want to speak to you. Another important point, she did not say, I want to speak to you. She said, I need to speak to you. Take your hands out of your pockets, and I need to speak to you. When you are telling somebody what to do, you are taking on the role of a dominant authority. You are the dominator. They are the dominee. You are telling them you are going to put your hands where I tell you to put your hands, and you need to speak to me. An analogy, imperfect as it may be, is the employee-employer relationship. An employer tells you, hello, Mr. Carr, I need to speak to you. Do you feel like you can just ignore that? That really takes us out of the context of a consensual encounter when you have these orders and a statement to the defendant that you need to speak to me. Why do I have to speak to you? Well, I'm investigating a crime, and I need to speak to you. That is affirmative misleading. What she told him, in essence, is, yes, you do need to speak to me. You may think that you don't have to, but I'm telling you I need to speak to you. So let's assume he was seized. Did he ever affirmatively say, I don't want to talk with you? He asked why did he have to. That's, I guess, part of my point is, and what the government seizes on in the court, is that he never expresses unequivocal unwillingness. He never used this talismanic phrase. He's walking towards her, and she says, take your hands out of your pocket, takes them out, and then immediately puts them back in. And this is repeated four times. Your Honor, I would take some exception to immediately. I don't know that the record supports that. What the record does support is that there was placement in and out of the pocket. Let's take immediately out of the question. Whatever time was involved, she had to ask him four times to take his hands out of his pocket, and each time he would comply, but then put his hands back in his pockets. Right? Yes. Okay. And she asked him if he had any weapons on him. Yes. And he said, he didn't say, I don't want to talk to you. He said, no, I don't. But this was after he asked why he had to speak to her, after she refused to answer that question, or did not give him the proper response to that question. It's interesting, but I just don't think that the law should be. I don't understand what you think the police officer should have done. She gets a call, says that there's somebody standing by a car. It looks suspicious to me. She gets there. There are people standing by a car. It looks like they may be stripping it, doing something. She approaches them. What is she supposed to do? Well, the first point is. You don't have to talk to me. Was she supposed to leave, or what is she supposed to do? Well, I would submit that there is a strong policy reason why, when somebody asks, why do I have to speak to you, that they have a duty to say, to tell them the correct answer to that. But I also would say that there are a lot of other things that she could have done here before she attempted to engage in this encounter. She could have run the car. If she would have ran the car while she was sitting in her squad car, it would have come back and it would have shown that it wasn't stolen. There's a lot of non-constitutional things she could have done. Nobody suggests that complying with the Fourth Amendment doesn't make law enforcement function more difficult. I mean, it does make it more difficult. It would be a lot easier if she didn't have to worry about the Fourth Amendment. At what point did she violate the Fourth Amendment? When she attempted to seize Mr. Roberts without a sufficient reasonable suspicion background of facts to do that. She attempted to seize him before she had enough facts to do it. That is where the seizure occurred. And that was when? Excuse me? When? At the very inception of the search, of the seizure. Right when she asked him to come toward her, he protested. She orders him to show his hands. He asks the questions and she doesn't answer. Okay. Right in the beginning. Pages 100 to 102. And I'd like to reserve my last 20 seconds if I may. Thank you. Good morning. May it please the Court. Elizabeth Olsen on behalf of the United States Counsel. Obviously, the touchstone of the Fourth Amendment is reasonableness. And so I think Judge Schroeder's question about what the officer should have done is really the focal question. The question here is whether any of Officer Griffin's actions were unreasonable given the facts that confronted her and the circumstances as they evolved in this encounter with Mr. Roberts. I agree that pages 100 to 102, in fact, all of Officer Griffin's testimony, is key, as is the magistrate and the district court's findings of that. And I think that there are a couple of factual questions or factual points that I would correct with the record. When Officer Griffin first showed up at the white Firebird that had been the subject of the citizen's call and saw Mr. Roberts standing next to the car, she said, and this is the district court's finding on page 16, in a polite conversational tone, hi, sir, can I talk to you for a minute? Now, he asked why. And his first question is, why do you want to talk to me? And she explained she had been called, there had been a report of some suspicious activity surrounding this vehicle. She was called to investigate. And then she said, and so I need to talk to you for a moment, if you will talk to me. At that point, he very hesitantly began moving towards her, eyes downcast, not really looking, hands in his pockets. Now, she did ask, and she asked respectfully and politely, sir, will you please take your hands out of your pocket? And she asked him several times. He would take his hands out of his pockets and then put them back in. And it is true that eventually she explained to him, the reason I'm asking you to take your hands out of your pocket is a matter of officer safety. Will you please keep your hands where I can see them? And after the third, I mean, she said it was three or four times. And at one point she did say, sir, you need to keep your hands out of your pocket. Now, what this court said in Enslin, and I use this court's terms, this is not my characterization, that an order to an individual to show their hands is technically a seizure, but that it is such a de minimis intrusion that when weighed against officer safety, it is inappropriate to analogize to a Terry stop, that it is such a de minimis intrusion. And that was this court's conclusion in Enslin, that although it's technically a seizure, it doesn't rise to the level of a Terry stop. At this point, the defendant was citing a bunch of Terry stop cases, and this Court said that the defendant's reliance on these Terry stop cases was misplaced because those cases didn't involve a de minimis intrusion on liberty, and that this was such a de minimis intrusion that although technically a seizure, it didn't when weighed against officer safety, it didn't rise to that level. It's interesting that it's kind of two inconsistent statements. It's technically a seizure, but it's not a seizure. It's technically a seizure, but in the footnote, the Court says, although technically a seizure, it's such a de minimis intrusion that when weighed against officer safety, it's not unreasonable. And then the footnote says the defendant's relying on all these Terry stop cases, but that reliance is misplaced because those cases didn't depend on a de minimis or didn't involve a de minimis seizure. And that's Enslin. Enslin, yes. Yes. And then the defendant says something out of left field. The defendant says, why do you have to search me? Now, the officer testified. At this point, she had said nothing about searching him. So this sent off flares in her head, and any reasonable officer, here's this person. She's saying, may I talk to you? I need to talk to you if you will talk to me. And he says, why do you have to search me? Now, at this point, she's concerned, coupled with the fact that he is repeatedly putting his hands back in his pocket three or four times after she's asked him and then directed him to keep her hands, his hands, where she can see them, as a matter of officer safety. At this point, coupled with the fact that she's responding to a call from a citizen about suspicious activity around this car, he's standing next to this car, he won't keep his hands visible even after she's requested, and then he says, why do you need to search me? Now, all of those things together are certainly more than Officer McFadden had in Terry. I mean, she has got the question is whether a reasonably prudent officer would believe that this defendant might be armed and dangerous. And so to keep, to maintain status quo so that she can complete her investigation without fear of violence, she says, she asks him, do you have weapons? He answers the question, no. She says, well, I'm going to pat you down for officer safety, at which point he takes an aggressive stance, raises his arms, says, no, you're not going to search me. And at that point, she draws her weapon. As they're handcuffing the defendant, she sees the loaded .38 caliber firearm in his jacket pocket. Obviously, it's a totality of circumstances test. You have to look at all of it together. In his opening remarks, defense counsel said a couple of times that the defendant had said early on, had said, I do not want to speak with you. In fact, he never said, I do not want to speak with you. And it is true that he doesn't need to say. I mean, the test isn't whether the defendant unequivocally declined. The test is whether a reasonable innocent person would have felt free when the officer arrived and said, may I speak with you? Why? Because there have been reports of suspicious activity, I'm investigating whether a reasonable innocent person would have said, you know, I don't want to get involved in this and walk away. And under Terry, the conversational tone, the request not in order, the request to speak, a reasonable innocent person, as the district court found, would have felt free to simply decline to get involved. Once the officer go ahead. No, go ahead. Once they tell him to take his hands out of his pockets, would a reasonable person feel free to leave? I think so. At that point, she had said, I mean, the first request to take his hands out of his pockets, she said, may I speak with you? As he starts walking towards her, she says, would you please take your hands out of your pockets so that I can see them? At that point, again, I do think that a reasonable innocent person would say, you know, might think, what am I getting involved in here? I don't want to be involved in this. You know what? I'm just going to go away. Obviously, the standard of a reasonable innocent person, I mean, that is a person who doesn't have too much compunction about asserting his or her constitutional rights, as, you know, Mendenhall and all the other Supreme Court cases and this Court's cases have shown. But at that point, even after, once the officer orders him to take his hands out of his pocket, at that point, that is after he has said, why do you need to search me, when the officer hadn't said anything about searching him, and had, you know, at that point, three or four times, had put his hands back in his pocket. At that point, regardless whether the seizure was then or not until she drew her firearm, at that point, she certainly had reasonable suspicion to do the frisk so that she could continue her investigation without fear of violence. Was she, Officer Griffin, asked what she would have done if he had simply turned and walked away at the very onset? I don't think that question was asked. Unless the Court has any other questions. Thank you. Thank you. Very briefly. The government knows that Enslin is not applicable to this case, and it's disingenuous for them to suggest it is. Monza-Guardo is the case that talks about Terry Stopp in order to show hands. I will note that when my client finally did say, no, you are not going to search me, they still used that factor against him in the reasonable suspicion calculus. They used all his questions, all his disinclination to engage in the encounter, all that the Court uses against him to find that what he did was suspicious. So what could the reasonable person do in this situation? Because you can't say anything that suggests you don't want to engage in the encounter because they're going to use that against you. No reasonable person in this situation would feel they are free to leave. Thank you, counsel. The case just argued is submitted for decision.
judges: Schroeder, Canby, Hawkins